IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ABIGAIL R., | |
| Plaintiff, | **8:21CV13** |
| vs. | |
| KILOLO KIJAKAZI, Acting Commissioner, | **MEMORANDUM AND ORDER** |
| Defendant. | |

This is an action under 42 U.S.C. § 405(g) for judicial review of the Social Security Commissioner's final decision denying Plaintiff's application for disability insurance benefits.[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

## I.  BACKGROUND

### A.  Procedural History

Plaintiff protectively filed an application for disability insurance benefits on October 29, 2018. (Tr. 10[2]). She alleged disability beginning June 25, 2018. (Tr. 10). The Social Security Administration ("SSA") denied her claim initially and upon reconsideration. She requested a hearing, which was held on May 11, 2020. (Tr. 33). The administrative law judge ("ALJ") denied Plaintiff's claim on May 28, 2020. (Tr. 7). On November 17, 2020, the Appeals Council denied review of the ALJ's

---

[1]  In accordance with General Order No. 2015-15 (Filing 3), the matter is submitted to the court on cross-motions (Filings 15, 17), based on review of the parties' briefs (Filings 16, 18, 19) and the administrative record (Filing 11).

[2]  All citations to "Tr." may be found in Filing 11.

decision, making the May 28, 2020, hearing decision the final decision of the Commissioner of Social Security. (Tr. 1).

## B.  The ALJ's Decision

In evaluating Plaintiff's claim, the ALJ followed the five-step sequential evaluation process. (Tr. 11-12). *See* 20 C.F.R. § 404.1520(a).[3] Plaintiff's date last insured is December 31, 2023. (Tr. 10). The ALJ found she had not engaged in substantial gainful activity since her alleged onset date of June 25, 2018. (Tr. 12).

The ALJ found Plaintiff had the following severe impairments: residuals of left hip surgeries, degenerative disc disease of her lumbar spine, status post fusion, migraines, obesity, depression, and anxiety. (Tr. 12). The ALJ found Plaintiff's impairments did not meet or equal the Listings of Impairments. (Tr. 13-15). The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a)[4] with the following limitations:

---

[3] The five steps are: "(1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ('Appendix'); (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." *Id.* (citations omitted).

[4] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

she is able to stoop, kneel, crouch, and crawl occasionally. The claimant
is able to perform work that does not require sustained exposure to
extreme temperatures or vibration. She is able to perform work in a
setting where the worker is allowed to use a cane when walking and
able to perform all the lifting and carrying required by sedentary work
by using her free hand alone. The claimant is able to understand,
remember, and persist at a consistent pace while performing tasks that
are simple, straightforward, and uncomplicated. She is able to exercise
proper judgment in performing those tasks and to respond appropriately
to at least routine changes in the workplace and to routine supervision.
The claimant is able to respond and behave appropriately without
distracting others when performing tasks that do not require more than
incidental and superficial interaction with co-workers or the public.

(Tr. 15).

The ALJ found Plaintiff was not able to perform her past relevant work as an
EKG technician and a surgical technician. (Tr. 22). The ALJ found, given Plaintiff's
vocational profile and RFC, she could perform other sedentary unskilled work that
existed in the national economy. (Tr. 23). Specifically, the ALJ found that Plaintiff
was able to perform the occupations of Document Preparer, DOT #249.587-018,
with 28,000 jobs in the national economy; Polisher of Eye Frames, DOT #713.684-
038, with 23,000 jobs in the national economy; and Addresser, DOT #209.587-010,
with 19,000 jobs in the national economy. (*Id.*). Consequently, the ALJ found
Plaintiff was not disabled. (Tr. 23).

## II.  EVIDENTIARY MATERIALS

### A.  Administrative Hearing Testimony

At her administrative hearing, Plaintiff testified that she lives with her mother
and has not worked since the alleged onset date of June 26, 2018. (Tr. 40-41). She
stated she had a tear in her left hip that caused pain when sitting, walking, or
standing. The tear was repaired twice in 2011 and 2017, but the second surgery did
not provide relief. (Tr. 41).

3

Plaintiff had back surgeries in 2006 or 2007 and 2018. (Tr. 42). The back surgery in 2018 led her to stop working. (Tr. 42). Plaintiff experiences numbness and attacks where pain is very intense followed by numbness and loss of strength. (Tr. 43). As a result, she "fall[s] down quite a bit," usually twice a week. (Tr. 43, 49).

Plaintiff sleeps in a recliner because lying flat causes pain and leg numbness. (Tr. 45). She uses a cane and walker, but prefers the walker. (Tr. 45). Plaintiff's mother does, or assists with, most household activities. (Tr. 45-46). Plaintiff claims her morning dressing and bathing routine takes three hours to complete due to having to take sitting breaks between each task. Because of the effort required to dress and bathe, she only does the complete routine every two to three days. (Tr. 51-53).

Plaintiff can sit and stand for 30 minutes at a time. (Tr. 48). She cannot sit in a regular chair long enough to enjoy a meal. (Tr. 48). If Plaintiff has been sitting for 30 minutes, she needs to "grab on to the walker or a countertop to help me pull myself up . . . . By that time, my legs get pretty weak. I have to hang on until I'm on my feet and my legs are kind of woken up." (Tr. 48-49). Plaintiff spends a lot of time elevating her legs in a recliner; if she fails to do so, her "ankles get very large and my feet turn purple." (Tr. 45).

For her pain, Plaintiff has unsuccessfully tried medications, injections, and physical therapy through her pain-management provider. While the physical therapy helped with range of motion, it did not improve her pain. (Tr. 43). She currently takes a muscle relaxant and a migraine medication, but both make her tired. (Tr. 44).

Plaintiff started seeing a psychiatrist every two weeks in 2019, and she also sees a therapist every two weeks. (Tr. 47). She explained she has crying spells every day, panic attacks, and suicidal thoughts. (Tr. 47-48). Her panic attacks last one to three hours, mostly occurring when the sun is setting, but also sometimes in the mornings. (Tr. 50). Plaintiff has migraines with an aura and vomiting about four days

4

a week—an increase from the twice-a-month migraines she previously experienced. (Tr. 50).

> Plaintiff explained why she cannot perform a sit-down job:
>
> Pain from sitting. I don't know what kind of an office or desk setup. I wouldn't have a way of elevating my legs. My focus and my ability to keep a task and complete it with any kind of attention to detail or accuracy is terrible. And I don't know how getting in and out of the building would work. What happens when I stand up or when I sit down, you know, if I fall? I just don't see—

(Tr. 49).

The vocational expert ("VE") testified that Plaintiff would not be able to perform the sedentary work the expert identified (document preparer, polisher of eye frames, and addresser) if any of the following were true: she used a walker; she needed to change positions every 20-30 minutes, including holding onto a counter or walker for five minutes before resuming activity; she needed to sit in a recliner during the workday; she fell so much that she was "off-task" more than 10 percent of the work day; she missed two or more days of work per month; or she could perform work at a consistent pace, attend work, handle conflicts with co-workers, or manage psychologically-based symptoms such as crying only 85 percent of the time, as Dr. Gallner opined. (Tr. 56-59).

## B.  Relevant Medical and Opinion Evidence

### 1.  Medical Evidence

The court adopts Plaintiff's description of the relevant medical evidence (Filing 16 at 6-15) to the extent it is admitted by the Commissioner. (Filing 18  at 2-3). The court also adopts the Commissioner's Supplemental Facts. (Filing 18 at 3-14). Together, these statements provide a fair and accurate description of the relevant

record before the court. Additional specific facts will be discussed as necessary to address the parties' arguments.

## 2. Opinion Evidence

On April 17, 2020, Nancye Hasiak, APRN-NP, outlined Plaintiff's history of disc herniation, lumbosacral pain, radiculopathy, surgeries, migraines, and depression, and provided her opinions concerning Plaintiff's limitations as a result of these conditions. (Tr. 650-51). Ms. Hasiak explained that because Plaintiff's symptoms and their severity have only progressed over time, she is now using a walker to ambulate because she does not know when her leg weakness will peak. (Tr. 650). She noted: "[Plaintiff] is rating her pain at a 9-10 on all of her office visits with me and is visibly very uncomfortable. . . . She has tried multiple medications and regimens with out [sic] good results, these medications can cause sedation and drowsiness as well." (*Id*.) Ms. Hasiak opined:

> I do feel that with all her pain, migraines and subsequent sequela from these it would be impossible for her to work and if she did she would miss several days or need to have a very limited schedule and would need a great deal of flexibility.

(*Id*.)

On April 21, 2020, psychiatrist Dr. Gallner provided his opinions concerning Plaintiff's mental limitations. (Tr. 642-46). Dr. Gallner listed diagnoses, medications, and symptoms; characterized Plaintiff's prognosis as poor; and stated:

> [Plaintiff] suffers from severe depression and anxiety resulting in difficulty interacting with others, adapting to change, poor ability to regulate emotions, difficulty focusing for extended periods of time and would struggle with regular work attendance[.]

(Tr. 645; *see also* Tr. 642).

6

Specifically, Dr. Gallner noted that Plaintiff was most limited in asking and answering questions and providing explanations; focusing attention on work activity or staying on task at a sustained rate; working appropriately and at a consistent pace; completing tasks in a timely manner; sustaining an ordinary routine and regularly attending work; working a full day without needing more than the allotted number or length of rest periods during the day at a consistent pace without an unreasonable number and length of rest periods; handling conflicts with others; responding to requests, suggestions, criticism, correction and challenges; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; and managing psychologically-based symptoms. (Tr. 643-45). Dr. Gallner noted that these limitations were due to her severe depression and anxiety, conditions that had "not responded well to psychotropic medications or regular psychotherapy." (Tr. 642, 645). As a result, she was expected to be off-task 15 percent of a workday and miss work more than two days a month due to her impairments. (*Id.*).

Curiously, Dr. Gallner noted that the earliest his description of Plaintiff's symptoms and limitations applied was June of 2018—but he did not begin treating Plaintiff until November 11, 2019. (Tr. 642, 646).

### III.  STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and

means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (internal quotation marks and citations omitted).

The Court must also determine whether the Commissioner's decision is based on legal error. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating allegations of legal error are reviewed de novo).

## IV.  ISSUES PRESENTED

As set out in the Table of Contents of Plaintiff's brief in support of her motion to reverse the Commissioner's decision (Filing 16 at 1), Plaintiff contends:

1.     The ALJ's Step-Five denial of benefits is not supported by substantial evidence due to the ALJ's SSR 00-4p error.

2.     The ALJ did not articulate a sufficient explanation for finding Dr. Gallner's treating-psychiatrist opinions and Ms. Hasiak's treating-primary-care opinions unpersuasive.

3.     The ALJ erred by not fully and fairly developing the record concerning "some medical evidence" support for the RFC.

## V.  DISCUSSION

### A.  Alleged SSR 00-4p Error

SSR 00-4P requires an ALJ to resolve conflicts between vocational evidence provided by a VE that is inconsistent with information provided in the Dictionary of Occupational Titles ("DOT"). When there is such a conflict, the ALJ "has an affirmative responsibility to ask about any possible conflict," including asking the VE "if the evidence he or she has provided conflicts with information provided in the DOT" and "obtain[ing] a reasonable explanation for the apparent conflict." *Pol'y Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000), *available at* 2000 WL 1898704 at *4 (2021).

Plaintiff argues that the ALJ's failure to recognize and resolve an apparent conflict between the VE's testimony regarding jobs Plaintiff could perform and the reasoning-level requirements of the sedentary jobs relied on to deny Plaintiff benefits at Step Five necessarily makes that denial unsupported by substantial evidence. Specifically, Plaintiff argues that the ALJ's RFC stating that Plaintiff can perform "tasks that are simple, straightforward, and uncomplicated" and can respond appropriately to "routine changes in the workplace" created an apparent conflict with the Reasoning Level 2 and 3 jobs the VE testified Plaintiff could perform, and the ALJ improperly failed to recognize or seek an explanation from the VE regarding that conflict. (*See* Tr. 23—Document Preparer, DOT #249.587-018, 1991 WL 672349 (Reasoning Level 3); Polisher, Eyeglass Frames, DOT #713.684-038, 1991 WL 679267 (Reasoning Level 2); Addresser, DOT #209.587-010, 1991 WL 671797 (Reasoning Level 2)).

Plaintiff asserts that the performance of "simple, straightforward, and uncomplicated" tasks conflicts with the Level-3-reasoning requirements of the Document-Preparer job, which necessitate that one "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." 1991 WL 672349. Plaintiff also argues that the "simple, straightforward, and uncomplicated" RFC language conflicts with the Level-2-reasoning requirement of the Eyeglass-Frame Polisher and Addresser jobs, which demands that one "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." 1991 WL 679267; 1991 WL 671797.

The Commissioner counters that the ALJ's RFC encompassed unskilled work at *both* Reasoning Levels 1 and 2, so the Plaintiff could perform both the Eye-Frame Polisher and Addresser jobs. (Filing 18 at 16). (The Commissioner apparently concedes that the Level-3-reasoning job—Document Preparer—was improperly included as a job the Plaintiff could perform.)

In *Moore v. Astrue*, 623 F.3d 599, 601-602, 604 (8th Cir. 2010), the ALJ found that the claimant had the RFC to perform work involving simple instructions and "simple, routine, and repetitive work activity at the unskilled task level." The jobs identified by the VE that Plaintiff could perform were hand packager and laundry worker, which required Reasoning Level 2. On appeal, the claimant argued that the ALJ erred in relying on the VE's testimony, asserting that the VE's testimony conflicted with the DOT because the ALJ's RFC limited her to occupations requiring Reasoning Level 1. The Eighth Circuit held:

> The ALJ did not err in relying on the vocational expert's testimony. In the hypothetical, the ALJ did not limit "simple" job instructions to "*simple one- or two-step* instructions" or otherwise indicate that Moore could perform only occupations at a DOT Level 1 reasoning level.

10

Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions. The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

*Id*. (emphasis in original) (citations omitted). The Eighth Circuit also stated: "There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs." The panel further noted: "the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of *every job* within the category." *Id*. at 604 (emphasis added). *See also Cerveny v. Saul*, 2020 WL 4260521, *10 (D. Neb. July 24, 2020) (Kopf, J.) (citing *Moore* and finding no reason to assume ALJ intended to limit claimant to Reasoning-Level-1 jobs when ALJ posed hypothetical to VE referring to "two, three, four[-]step tasks, simple, routine type work," but did not mandate—or even discuss—that claimant was limited to Reasoning-Level-1 jobs); SSR 00-4P, 2000 WL 1898704 at *3 ("The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.").

Similarly, here there is no apparent conflict about which the ALJ was bound to question the VE. The ALJ's RFC finding that Plaintiff can perform "tasks that are simple, straightforward, and uncomplicated" and can respond appropriately to "routine changes in the workplace" does not conflict with the DOT Reasoning-Level-2 requirements of the Eyeglass-Frame Polisher and Addresser positions that one "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." 1991 WL 679267; 1991 WL 671797. The ALJ's RFC addresses the nature of the tasks Plaintiff can perform and the

manner in which she can respond to change; in contrast, the DOT requirements concern how one carries out instructions of a specified complexity and how one deals with problems with a certain number of variables.

Because there was no apparent conflict between the ALJ's RFC and the DOT Reasoning-Level-2 requirements of the Eyeglass-Frame Polisher and Addresser jobs relied on to deny Plaintiff benefits at Step Five, the ALJ was entitled to rely on the VE's testimony regarding those jobs in reaching a Step-Five decision. *Moore*, 623 F.3d at 605; *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (VE testimony, based on a properly phrased hypothetical question, constitutes substantial evidence to support the ALJ's Step-Five finding). The VE testified that Plaintiff could work as an Eyeglass-Frame Polisher or an Addresser, and that there were 23,000 and 19,000 such jobs available in the national economy, respectively (Tr. 55). The Eighth Circuit has held that 10,000 jobs is a sufficient number to constitute a significant number of jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997). Further, assuming the inclusion of the Document-Preparer job—which requires Level-3 reasoning—was error, it was harmless because two jobs that exist in significant numbers in the national economy remained. *O'Connell v. Saul*, No. 18-CV-2072, 2019 WL 4784613, at *12 (N.D. Iowa Sept. 30, 2019) ("District courts in the Eighth Circuit . . . have held that an inconsistency between the VE's testimony and the DOT is harmless if at least one job remains the claimant can perform that is consistent with the DOT, and the VE's testimony establishes that this job exists in significant numbers in the national economy."). Therefore, the ALJ properly relied upon the VE's testimony in this case, and substantial evidence supports the ALJ's Step-Five finding of no disability.

## B.  Persuasiveness of Dr. Gallner's and Ms. Hasiak's Opinions

Plaintiff asserts that the ALJ did not articulate a sufficient explanation for finding unpersuasive the opinions of psychiatrist Dr. Gallner and nurse practitioner Ms. Hasiak.

The ALJ found unpersuasive Dr. Gallner's psychiatric opinion that Plaintiff would be off-task 15 percent of her workday and miss work more than two days a month due to her psychological impairments. (*See* Tr. 21). The ALJ explained he found Dr. Gallner's opinion not persuasive for the following reasons: (1) Dr. Gallner did not provide clinical or other objective medical findings to support his proposed limitations beyond Plaintiff's own reports of her difficulty concentrating and interacting with others; (2) Dr. Gallner did not identify support for his opinion that Plaintiff would be off-task 15 percent of the workday and would miss more than two days of work per month limitations; (3) Dr. Gallner's treatment notes did not support his opinion because such notes reflected "claimant's normal memory, attention, and concentration," Plaintiff "was alert and in no acute distress at their appointments," her "rate of thoughts, abstract reasoning, and thought process was normal," and there was no documented evidence of "abnormalities consistent with the severity of limitations offered in [Dr. Gallner's] opinion"; (4) Dr. Gallner opined that Plaintiff's limitations were present as of June 2018 even though he did not start treating Plaintiff until November 2019 and only saw her four times; (5) Dr. Gallner's opinion was inconsistent with Plaintiff's "normal mood, affect, and behavior at other healthcare encounters since her alleged onset date"; (6) Dr. Gallner's opinion was inconsistent with Plaintiff's reports that she had "mild to moderate improvement in depression and anxiety with Lexapro" and she found therapy helpful; and (7) Plaintiff did not seek mental-health treatment before November 2019, which "call[s] in to [sic] question the severity of her symptoms in the period after her alleged onset date and before she began treatment." (Tr. 21-22).

The ALJ also found Ms. Hasiak's primary-care opinion that Plaintiff would "miss  several days of work and . . . need to have a very limited schedule with a great deal of flexibility" was not persuasive because Ms. Hasiak did not identify objective medical evidence supporting her opinion, and the remainder of the medical evidence in the record did not support Ms. Hasiak's opinion. The ALJ noted that "the claimant did not seek treatment for migraines with a frequency supporting this opinion [and]

her physical examinations and diagnostic imaging do not support the contention that she experiences debilitating pain." (Tr. 20, 21).[5]

On January 18, 2017, the SSA published revisions to its regulations regarding the evaluation of medical evidence. *See Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5,844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)). The revised regulations, which became effective for benefits applications filed on or after March 27, 2017, as in this case, changed how an adjudicator is to consider medical opinions. The revised regulations eliminate the rule that a treating source's opinion is entitled to particular weight; instead, medical opinion evidence—whether it comes from a treating, examining, or consulting physician—is to be evaluated according to five factors listed in 20 C.F.R. § 404.1520c.[6]

> According to the rule, supportability and consistency are the most important factors and must be addressed by the ALJ in his or her decision. Thus, while the new rules do not dictate the weight the ALJ is to ascribe to any given medical opinion, the ALJ is required to explain why she finds a medical opinion to be persuasive or not.

*Mackling v. Saul*, No. 8:20CV347, 2021 WL 2982111, at *6 (D. Neb. July 15, 2021) (internal citation omitted); 20 C.F.R. § 404.1520c(a).

---

[5] The concluding sentence of the ALJ's discussion of why Ms. Hasiak's opinion is not persuasive erroneously states, "the undersigned finds Ms. Hasiak's opinion persuasive." (Tr. 21). The court construes this as an unintentional error.

[6] Those five factors are (1) supportability; (2) consistency; (3) relationship to the claimant, which includes (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(c).

Further, the SSA removed from the definition of "medical opinions" symptoms, diagnosis, and prognosis because those concepts do not describe a claimant's functional abilities and limitations. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 81 Fed. Reg. 62560-01, at 2016 WL 4702272, at *62562 (Sept. 9, 2016). For claims filed by adults on or after March 27, 2017, a "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in your abilities to perform physical, mental, and other demands of work and to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2)(i)-(iv).

Here, the ALJ properly recognized that 20 C.F.R. § 404.1520c is the applicable regulation for evaluating opinion evidence in this case. (Tr. 15, 19-20). As explained above, that regulation directs ALJs to evaluate the persuasiveness of medical opinions based on supportability and consistency.

The ALJ's discussion with regard to Dr. Gallner's opinion fully complied with the requirements of 20 C.F.R. § 404.1520c. The ALJ addressed the supportability factor at length, noting that Dr. Gallner failed to provide any clinical or other objective medical evidence to support his limitations, instead relying on Plaintiff's subjective reports of symptoms, which do not constitute "objective medical evidence, which is the proper basis for an acceptable medical source." (Tr. 21). The ALJ further noted the lack of a basis for Dr. Gallner's specific opinion that Plaintiff would be off-task 15 percent of each workday and would miss more than two days of work per month, particularly when his treatment notes consistently found that Plaintiff's memory, attention, concentration, abstract reasoning, thought process, and rate of thoughts were normal. (Tr. 605-06, 610, 613-14, 617). The ALJ also considered the consistency factor, finding that Dr. Gallner's opinion was inconsistent with other providers' mental-status examination findings, his own treatment notes, Plaintiff's reports that she experienced symptom improvement with medication and therapy, and Plaintiff's failure to seek any mental-health treatment until November 2019. (Tr. 273, 275, 294, 308, 316, 336, 342, 351, 355, 365, 369,

15

534, 540, 550, 554, 576-577, 583, 604, 606, 608, 610, 612, 636). The ALJ properly discussed the persuasiveness of Dr. Gallner's opinion based on its supportability and consistency with the record as a whole.

The ALJ also discussed the persuasiveness of Ms. Hasiak's opinion that "with all [of Plaintiff's] pain, migraines and subsequent sequela from these it would be impossible for her to work and if she did she would miss several days or need to have a very limited schedule and would need a great deal of flexibility." (Tr. 650). The ALJ concluded that this opinion was unpersuasive because Ms. Hasiak did not identify objective medical evidence supporting her opinion, and the remainder of the medical evidence in the record also did not support Ms. Hasiak's opinion.

The ALJ first reasoned that Ms. Hasiak's opinion was unpersuasive because she did not identify objective medical evidence to support her opinion. Objective medical evidence consists of "signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f). Signs are "anatomical, physiological, or psychological abnormalities that can be observed, apart from [an individual's] statements (symptoms)" and "must be shown by acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1502(g). Instead of providing an explanation of objective medical evidence consistent with these regulations, Ms. Hasiak primarily described Plaintiff's diagnoses, symptoms, and behaviors. Therefore, the ALJ properly determined that Ms. Hasiak's opinion was not supported by objective medical evidence.

The ALJ next found that Ms. Hasiak's opinion was not supported by the remainder of the medical evidence in the record. Specifically, the ALJ concluded: "As discussed above, the claimant did not seek treatment for migraines with a frequency supporting this opinion. Moreover, her physical examinations and diagnostic imaging do not support the contention that she experiences debilitating pain." (Tr. 21). While the ALJ did not repeat his previous citations to, and discussion of, Plaintiff's medical records concerning her migraines and alleged pain in analyzing the persuasiveness of Ms. Hasiak's opinion, the ALJ's opinion previously

16

discussed these issues in detail. With regard to Plaintiff's migraine headaches, the ALJ found:

> Considering the claimant's migraine headaches, it does not appear that she reported an issue with her medication regimen between her alleged onset date and February 2020. It would reasonably be expected that the claimant would have reported headaches with the frequency or severity alleged at the hearing if these occurred before February 2020. At that appointment, she was advised to inform her treatment provider of her response to the medication changes (8F/18). The record does not include evidence of that follow-up, other than a statement from the claimant's APRN in April 2020 that the claimant was experiencing migraines less frequently (10F). Overall, the evidence before the undersigned does not support the claimant's allegations regarding the frequency or severity of her migraine headaches.

(Tr. 19).

With regard to the intensity, persistence, and limiting effects of Plaintiff's alleged pain, the ALJ provided the following analysis with citations to the medical evidence before him:

> The objective medical evidence supports a residual functional capacity for sedentary exertion as opposed to the claimant's allegations regarding the severity of her symptoms and associated limitations. Diagnostic imaging of the claimant's left hip did not show degenerative changes (6F/25). Her left hip strength was 4 or 5 out of 5 on examination (2F/2). The claimant's lower motor strength was intact at other appointments (1F/101, 105, 110 and 3F/15). She was able to stand without difficulty (7F). The claimant was observed ambulating with a steady gait (1F/86, 4F/3, 6F/12, 7F, and 8F/17). She had reduced tenderness to palpation and an improved range of motion after physical therapy (2F/1-2). This objective medical evidence does not support the claimant's reported limitations in standing, walking, and/or sitting due to her history of left hip surgeries.

17

Next, the record does not include diagnostic imaging showing that the claimant's lumbar spine degenerative disc disease has caused radiculopathy after her surgery. Again, she has demonstrated full strength in her lower extremities and a normal gait. The claimant did not appear to be in acute distress at her healthcare encounters after the alleged onset date (3F/3, 4F/3, 6F/19, 7F/4, and 8F/17). This is not consistent with chronic debilitating lower back and radiating pain. The claimant's physical examinations did not reveal ankle swelling as alleged at the hearing.

Similarly, the record indicates that while the claimant reported use of a walker, such use was not observed by a healthcare provider (6F/9 and 10F). The evidence before the undersigned does not suggest that a walker has been prescribed to the claimant since her alleged onset date. Further, the record does not include evidence of an observed fall or treatment for fall-related injuries after June 25, 2018. If the claimant were falling or experiencing lower extremity weakness/numbness with the frequency alleged, it would be reasonably expected that her physical examinations, diagnostic imaging, or other objective medical evidence would capture related findings.

Moreover, the undersigned notes that the claimant's reports to her healthcare providers are not entirely consistent with her allegations in support of the instant application for benefits. For example, the claimant reported an increased ease with walking and getting in and out of chairs to her physical therapist (2F/1, 19, 27). With physical therapy to her left sacroiliac joint, the claimant's gluteal and posterior thigh pain significantly improved (1F/107). Additionally, the claimant denied radicular symptoms and affirmed normal lower extremity sensation and muscle control (1F/107, 111). The undersigned notes here that in her Daily Activities and Symptoms Report, the claimed described a greater residual functional capacity than alleged at the hearing (4E).

Furthermore, the claimant reported some pain relief with the use of tape (2F/21, 43). Ice and muscle relaxants improve her pain (6F/15). Conversely, the claimant experienced increased pain with activities such as being more active over a holiday weekend, taking care of her parents, cleaning her garage, vacuuming, and washing the patio (2F/5, 33, 66, 94). These activities suggest a greater residual functional

capacity and more effective pain relief with treatment than otherwise
alleged.

(Tr. 18-19).

The ALJ did not err in concluding that Ms. Hasiak's opinion was unpersuasive
because it was not supported by the remainder of the medical evidence in the record.
*Catherine T. v. Kijakazi*, No. 8:20-CV-404, 2021 WL 5741941, at *8 (D. Neb. Dec.
2, 2021) (ALJ did not err in rejecting physician's opinion when ALJ clearly
articulated how she considered medical opinion without boilerplate or blanket
statements and how she weighed supportability and consistency factors; "The
question is not if the Court might have reached a different conclusion, but whether
the ALJ's decision is outside the zone of choice.")

The ALJ articulated a sufficient explanation for finding unpersuasive the
opinions of psychiatrist Dr. Gallner and nurse practitioner Ms. Hasiak.

## C. Development of Record Concerning "Some Medical Evidence" Supporting RFC

Finally, Plaintiff argues that the ALJ should have further developed the record
by obtaining another medical opinion or expert medical testimony as to Plaintiff's
mental impairments since the ALJ found Dr. Gallner's opinion unpersuasive and
since "[t]he opinions of [Plaintiff's] psychotherapist were missing from this record."
(Filing 16 at 25). Second, Plaintiff argues that her testimony at the hearing regarding
recent falls and her use of a walker at home required the ALJ to order a "physical
consultative examination as to what was going on with [Plaintiff's] walker use."
(Filing 16 at 25). Third, Plaintiff asserts that the ALJ should have more fully
developed the record as to Plaintiff's ability to sit since she complained about sitting
to the SSA and to several of her providers, yet the ALJ did not include a requirement
in the RFC that Plaintiff be allowed to periodically change positions while

19

performing the sitting required for jobs at the sedentary exertional level. (Filing 16 at 26).

It is the Plaintiff's responsibility to provide specific medical evidence to support her claim. 20 C.F.R. § 416.912(a); *see Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). The burden of proof remains at all times on the claimant to prove disability and to present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). The ALJ has a duty to fairly and fully develop the record independent of the claimant's burden of proof. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 824 (8th Cir. 2008). In determining whether an ALJ fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *Haley v. Massanari*, 258 F.3d 742, 749-750 (8th Cir. 2001); *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).

"There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008). Reversal for an ALJ's failure to develop the record is only warranted when such failure is unfair or prejudicial. *Haley*, 258 F.3d at 750.

Here, the record contained sufficient evidence for the ALJ to make an informed decision regarding the extent and limiting effects of Plaintiff's impairments. The ALJ had the longitudinal treatment record before him, which was supportive of his determination of no disability (Tr. 265-543, 548-562). In addition, the ALJ had the benefit of the prior administrative medical findings (Tr. 65-71, 79-84), statements from two of Plaintiff's medical sources (Tr. 641-647, 650-651), a third-party function report (Tr. 208-210), pain questionnaire (Tr. 202-206), and Plaintiff's hearing testimony describing her alleged impairments, limitations, and

medical treatment (Tr. 38-53). Thus, the ALJ had an adequate basis for making his disability determination, and he had no duty to further develop the record.

This is especially so since Plaintiff has failed to show that any underdevelopment of the record was unfair or prejudicial. Indeed, at the administrative hearing, the ALJ asked Plaintiff's counsel whether the case was "ready for decision," and Plaintiff's attorney answered affirmatively and did not indicate that he desired to obtain a consultative examination or that the record was incomplete. (Tr. 60). In counsel's briefing in this court, he does not argue that if the ALJ had requested additional information, he would have arrived at a different decision. *Haley*, 258 F.3d at 750 (reversal for failure to develop record not warranted when claimant made no showing that such failure was unfair or prejudicial); *Knox v. Colvin*, 637 F. App'x. 956, 960 (8th Cir. 2016) (rejecting claimant's allegation of failure to develop the record, in part, because claimant herself never requested a consultative examination); *Novotny v. Saul*, No. 8:18-CV-437, 2019 WL 4942257, at *14 (D. Neb. Oct. 8, 2019) (court would not remand for further development of record when claimant failed to show prejudice or unfairness as a result of ALJ's failure to request further opinions).

## VI.  CONCLUSION

The ALJ's decision was supported by substantial evidence on the record as a whole and will be affirmed. Accordingly,

IT IS ORDERED:

1.      Plaintiff's Motion for an Order Reversing the Commissioner's decision (Filing 15) is denied.

2.      Defendant's Motion for an Order Affirming the Commissioner's decision (Filing 17) is granted.

3.      The Commissioner's decision is affirmed pursuant to sentence four of
42 U.S.C. § 405(g).

4.      Judgment will be entered by separate document.

DATED this 3rd day of January, 2022.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge

22